# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 13, 2009 Session

## STATE OF TENNESSEE v. STEVE CARL KING

**Direct Appeal from the Circuit Court for Giles County**
No. 12504      Robert L. Jones, Judge

---

**No. M2008-01251-CCA-R3-CD - Filed April 9, 2010**

---

A Giles County jury convicted the Defendant, Steve Carl King, of attempted first degree murder, and the trial court sentenced him to twenty-two years in the Tennessee Department of Correction. On appeal the Defendant contends: (1) the evidence was insufficient to support his conviction; (2) the trial court erred when it admitted statements the Defendant gave to Illinois police; (3) the trial court erred when it allowed two witnesses to testify although the State had failed to disclose their existence in accordance with Tennessee Rule of Criminal Procedure 16; and (4) the trial court erred when it denied the Defendant's petition for a writ of error coram nobis based on the victim's recanted testimony. After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the Appellant, Steve Carl King.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Renee W. Turner, Assistant Attorney General; Patrick Butler and Richard Dunavant, District Attorneys General; Jeff Burks, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant stabbing his girlfriend, Gloria McCormick, and running over her while driving his tractor-trailer at a rest stop in Giles County, Tennessee. In

February 2006, a Giles County grand jury indicted the Defendant for attempted first degree murder based on this event. In April 2006, before the Defendant's trial on this charge, the Defendant engaged in a physical altercation with the victim's brother, David Edwards, in a bar in Chicago, Illinois. Illinois police officers arrived to investigate the altercation, and, in the course of the investigation, the Defendant made several statements about his conduct in the events surrounding the November 2005 attempted first degree murder charge.

The Defendant's trial was set for November 6, 2006. On September 19, 2006, the State provided the Defendant with its initial list of witnesses who would testify at the Defendant's trial. On October 30, 2006, the State supplemented its original witness list to include one of the Illinois police officers who witnessed the Defendant's April 2006 statements. The Defendant moved before trial to suppress these statements, and the trial court took the matter under advisement.

At trial, the following evidence was presented: Gloria McCormick ("the victim"), who lived in Chicago at the time of trial, testified the Defendant had been her boyfriend for eleven years at the time of this attack. He was a commercial truck driver, and the victim sometimes accompanied him on his "runs." She was accompanying the Defendant on a run from Jacksonville, Florida, to Chicago when she received the injuries that were the basis of this prosecution. She recalled that on the day of the incident, November 4, 2005, she and the Defendant stopped in northern Alabama and gained permission to park the truck overnight in the parking lot of a Harley-Davidson shop.

After parking, they walked to a nearby Hooters where they shared three pitchers of beer. The victim estimated she consumed two mugs of beer from each pitcher. While at Hooters, the Defendant began to tell the victim she was a "whore," and that she was "fat" and "uneducated." The victim explained "[t]hat's just the way [the Defendant] gets when he drinks: He just starts calling me a whore." The name-calling escalated into an argument, and the pair left Hooters and returned to the truck. When she returned to the truck, the victim took their dog, a pit-bull, for a walk. When she returned to the truck, she and the Defendant resumed the arguing and "name-calling." The pair decided to continue driving rather than sleep at the Harley-Davidson shop, and they continued arguing as they drove.

At some point while they drove toward Tennessee, the Defendant reached behind the victim and retrieved a black-handled knife from a cabinet behind the victim's seat. She testified the Defendant had no set place he stored this knife, alternately carrying the knife in his jeans or storing it in various areas of the truck. The victim identified a knife police retrieved from the truck as the knife the Defendant retrieved. With the knife in hand, the Defendant then asked the victim if she "wanted to see how sharp his knife [was]." He then opened the knife and began to swing it at the victim, in the area between the passenger and

2

driver seats. The Defendant continued to swing the knife for several minutes while repeating his question, and the victim scooted as far away from the Defendant as she could, turning her back to the Defendant and clinging to the passenger door. The victim, at some point, raised her left hand to protect herself, and the knife sliced her ring and middle fingers. She began bleeding profusely and asked the Defendant to get her medical attention, but the Defendant initially refused, saying he knew she would have him arrested if she got medical attention. The victim got a cloth from the back of the cab and wrapped the cloth around her fingers. She then hung her hand out the passenger window to avoid bleeding in the truck because she did not want the Defendant "to get in trouble." The Defendant eventually agreed to stop at a rest area in order for the victim to get help.

The Defendant exited the highway at the Ardmore Welcome Center in Giles County and pulled up beside the sidewalk in front of the Welcome Center. The back portion of the truck's cab contained a top and bottom bunk, and the victim stored her clothes and medication beneath the bottom bunk's mattress in a storage compartment. When the Defendant pulled up to the sidewalk, the victim went to the back of the truck's cab to retrieve medication she needed for her multiple sclerosis. As she raised the mattress to access the storage compartment, the Defendant struck the victim in the back of the head, causing her to drop the mattress and fall onto the bed. The victim lost consciousness briefly and, consequently, could not clearly recall the details of what next occurred. She remembered seeing the Defendant standing over her, at which point she tried to rise from the bed, but the Defendant fought with her. She struck at the Defendant while he pulled her hair and screamed at her, continuing to call her a "whore," and tell her she was "fat" and "uneducated."

The Defendant eventually sat back down in the driver's seat. When the victim was finally able to rise from the bed, she retrieved the plastic bags that contained her medication. Carrying the bags, she returned to the front of the cab, opened the passenger door, and stepped down to the sidewalk. As she exited the vehicle, she saw the Defendant's knife on the dashboard. The pit-bull exited the truck with the victim.

On the sidewalk, the victim realized her legs and shorts were covered in blood. The victim could tell that blood was flowing "down [her] legs" and into her socks and shoes, but she did not realize she had been cut and could not identify from where she was bleeding. At trial, the victim identified a pair of jean shorts with several slashes in the back and crotch as the shorts she wore the night she was run over. The victim said the shorts were brand new and had no cuts or tears when she put them on before these events.

The victim saw a man behind the trailer, so she began to walk toward the man to ask him for help. The victim testified that, as she walked, she stopped and stared at the truck for reasons she could not recall: "I was walking and I stopped, and I stared at the truck. And I

3

don't know what I was thinking about.  I don't know why I stopped.  I just stopped."  The Defendant then moved the truck forward, turning so that its rear tires came onto the curb of the sidewalk.  The moving trailer hit the victim's shoulders, knocking her to the ground.  The victim said she landed on either her side or buttocks and was unable to rise before the trailer's back tires began to roll over her body.  The Defendant continued to drive the truck forward over her body, even as a man yelled for him to stop.  She recalled that the trailer kept moving forward after it ran over her body.

The victim then began to pass in and out of consciousness.  She next recalled seeing a man standing over her talking into a cell phone and requesting an airlift team immediately.  Her last memory is of hearing the Defendant say, "Oh, baby, I can't believe this; I've never seen anybody's body like this."  She woke up a month-and-a-half later in a hospital.

On cross-examination, the victim recalled that the passenger seat belt was broken and had been replaced with a bolt and screw.  She explained that the latch had been taken out and that, in order to fasten the seat belt, she inserted a bolt through a hole in the belt and fastened the bolt to a screw attached to the seat below her left buttock.

The victim testified she could not recall when she and the Defendant left Jacksonville, the name of the city in Georgia where they stopped along the way to Tennessee, the name of the city in Alabama where they stopped to visit the Harley-Davidson shop and the Hooters, or the time they arrived in the Alabama city.  She did recall that they drove between two and three hours before reaching the city in Georgia where they stopped and that the Harley-Davidson shop was closing when they arrived.  She explained her disorientation was due to the fact that, although she had accompanied the Defendant several times on the Chicago-Jacksonville run, the Defendant took a new route every time.  She also testified the Defendant took his prescribed Valium on the day of the incident, as he "always" did.

The victim recalled there was still daylight outside when she and the Defendant entered Hooters.  She estimated she consumed six twelve-ounce mugs of beer, and the Defendant consumed almost twice as much as she did at Hooters.  She denied she was drunk when she and the Defendant left Hooters around 10:00 p.m. but admitted she felt "buzzed."  She said she and the Defendant only lay in bed for a short time while the trailer was parked at the Harley-Davidson shop, while they continued to argue.  The victim conceded she cursed and called the Defendant names in response to his yelling.  Approximately forty-five minutes after leaving Hooters, the Defendant returned to the driver's seat and drove the truck back onto the interstate, despite their plans to spend the night in the parking lot.

When the Defendant began driving again, the victim returned to her place in the passenger seat and fastened her seat belt with the bolt and screw.  She recalled they had been

4

driving approximately thirty to forty-five minutes when the Defendant began swinging his knife at her. She struggled to free herself from her crude seat belt as he held onto the steering wheel and leaned toward her, continuing to swing the knife at her. She explained his knife cut her hand when she reached down to shield her legs from his swings. The victim recalled that blood immediately began to "pulsate" out of her fingers, but she denied waving her hand around the truck in a way that would spread blood throughout the cab. She also denied placing her hand in a cooler between the passenger and driver seat, insisting she would never put an open wound in a cooler that contained food. She said she finished freeing herself from the seat belt and hung her hand out the window for less than a minute until the pain became unbearable, at which point she went to the back of the cab to wrap a cloth she found on the floor around her fingers. She spent only a few seconds in the back of the cab and returned to the passenger seat where she remained until the Defendant exited the highway and parked at the Welcome Center one or two minutes later. She recalled it was around 10:30 p.m. at this point, so it was dark when they pulled off the highway.

The victim testified that when the Defendant stopped the truck in front of the Welcome Center, her wrapped hand was bleeding less. She then rose and entered the back of the cab. She recalled that, seconds after she entered the back of the cab, something struck her in the back of the head, knocking her to the lower bunk. The victim reiterated that she did not see the Defendant hit her, but she emphasized that she was facing the back of cab, away from the Defendant, when she was hit. She testified that she did not "really remember being . . . knocked out," saying, "[I]t's just because it all happened so fast. I dropped the bunk, and I fell onto the bed. And the next thing I know, I was getting up out of the bed. So I must have been knocked out or blacked out, . . . I don't know." The victim recalled fighting with the Defendant in the back of the cab, and she testified that at some point she hit the Defendant's face with her fist. The victim fell out of consciousness again, and when she regained consciousness, she saw the Defendant seated in the driver's seat. She testified that, when she woke up, she did not feel any pain, even in her hand, and that she did not notice any injury to her vaginal area, her buttocks, or her stomach.

The victim rose from the bunk and lifted the mattress again to retrieve her medication, which was inside one or more plastic grocery bags. She grabbed the bags against her chest because she could not find their handles and passed through the front of the truck's cab to exit the truck. She agreed that this placed her easily within the Defendant's reach and that the Defendant did not physically or verbally attempt to keep her from leaving the truck, despite his opportunity to do so. She agreed that the Defendant was still intoxicated when they arrived at the Welcome Center.

The victim reiterated that when she exited the truck she did not realize she was bleeding from anywhere other than her hand. She saw a public telephone, which she thought of using

to summon help because her cell phone battery was almost dead. Instead, having noticed a man standing behind the truck, she began to walk toward the man, traveling on the sidewalk along the side of the truck. At trial, the victim could not recall whether Michael Soloman, who testified he witnessed the victim being run over, was the man she saw. She estimated that she was half-way down the truck when she stopped and stared at the trailer. As she stared she heard someone tell the Defendant he could not park by the sidewalk, and then the trailer moved forward and knocked her to ground. The victim recalled that she screamed for the Defendant to stop moving the truck because she was lying on the ground beneath the trailer, in the path of the back tires. The truck continued moving, however, and the back tires ran over the victim's body. Emergency responders later discovered several wounds in her groin and abdominal area. She testified she did not recall how she received these wounds.

On redirect examination, the victim recalled that the Defendant, although he was intoxicated, did not have any difficulty operating the tractor-trailer after they left Hooters. She also recalled that the truck had come to a complete stop in front of the Welcome Center when she went to the back of the truck's cab and was hit in the head from behind.

Special Agent Michael J. Little, a forensic scientist supervisor with the Tennessee Bureau of Investigation was certified by the trial court as an expert in the area of toxicology. He testified he received blood samples taken from the victim at 3:00 a.m. and from the Defendant at 1:45 a.m. From these samples, he determined the Defendant's blood alcohol concentration ("BAC") was .05, and the victim's BAC was .06. On cross-examination, he explained that, after a person stops ingesting alcohol, his BAC level dissipates at a rate of between .01 and .02 per hour. Therefore, Agent Little explained, the victim and the Defendant's BAC levels could have been higher around 10:30 p.m.

Jeffery Dale Crews, a Special Agent Forensic Scientist with the TBI Crime Laboratory in Nashville and certified as an expert in the area of analytical toxicology, testified he received a blood sample from the Defendant and the victim. From the Defendant's blood sample, he identified diazepam, which is a tranquilizer. He identified amitrptyline, an anti-depressant, and nortriptyline in the victim's sample.

Michael Solomon, a maintenance worker at the Ardmore Welcome Center, testified he was working at the Welcome Center the night of the incident. Around 11:15 p.m., from inside the Welcome Center, he saw the Defendant's tractor-trailer pull up and park beside the sidewalk. Because the Defendant was blocking traffic as he was parked, Solomon walked outside to tell the Defendant to move. Outside, he saw the couple's dog walking around the ground near the trailer portion of the truck, and he saw the victim getting out of the cab. The victim turned around and grabbed three small shopping bags from the truck after she got out. Solomon described what he saw next:

6

[S]he just held the bags in her arms, and turned and walked down the side of the trailer. And about halfway down the trailer, she stopped, turned, facing the trailer. And the driver, in the meantime, put the truck in gear and started to pull over on the shoulder, off the ramp. And the trailer knocked her over, and the wheels ran over her mid-section.

He recalled that the truck continued moving after it ran over the victim, so he ran in front of the truck, flagging down the Defendant. The Defendant finally stopped when he was out of the lane of traffic. When the Defendant stopped, Solomon walked to the driver side of the cab and told the Defendant he had run over a lady. The Defendant said, "[N]o, I didn't," so Solomon told the Defendant to get out and come see the victim. Solomon and the Defendant approached the victim who lay near the curb on an area that was "more or less gravel." He said trucks commonly passed through this portion of the road and, when they did so, the tires of their trailers went over the curb, which had gradually worn away the grass from the area in which the victim lay.

Solomon recalled that the victim was unconscious and portions of her intestines were lying outside her body. Solomon called 9-1-1 on his cell phone and went inside the Welcome Center to get a flashlight. When he emerged from the Welcome Center, he found the Defendant kneeling over the victim and trying to give her water. Soon thereafter, emergency personnel responded.

On cross-examination, Solomon clarified that, because it was dark outside when he saw the victim climb down from the truck, he could not tell whether she was bleeding. He recalled that the victim spoke with the Defendant for less than a minute when she got out of the truck. Solomon said that the victim was walking in the gutter when she turned and began to walk to the end of the trailer. He explained that, although the Defendant kept moving the truck forward after he ran over the victim, he was not sure whether the Defendant was trying to drive back onto the interstate or to park the truck in a spot outside the parking lot. He further noted that many other truck drivers parked outside the lot when the parking lot was full, but Solomon could not recall whether the parking lot was full at the time of this incident. He recalled that, when he later found the Defendant kneeling beside the victim, he did not hear the victim say that the Defendant had cut her.

On further cross-examination, Solomon clarified that the victim spoke with the Defendant for two or three minutes after she descended from the truck. He also said that, in the two or three hours he spent at the Welcome Center after the accident, he did not notice any blood where the victim stood beside the passenger door while she spoke with the Defendant. Solomon said that, from where he stood, approximately thirty yards away, he did not notice

that the victim had any difficulty walking when she went from the door toward the back of the truck.

Maria Garrett, a Giles County Ambulance Service paramedic, testified she responded to the Welcome Center to attend to the victim on the night in question. She confirmed Solomon's testimony that the victim lay on her back eviscerated on the grass beside the curb when Garrett arrived. Garrett also recalled that the Defendant was kneeling by the victim's head, holding her hand, and telling the victim everything would be all right. She also observed that the victim suffered "crushing" trauma to her pelvic area and legs. She testified she removed the victim's shorts by cutting the material along the left side of the zipper and down through the legs areas. The State introduced the shorts into evidence, and Garrett agreed that the back of the shorts bore tears and cuts that Garrett did not make. She recalled that she attended to the victim until a Med-Flight team arrived to fly the victim to the Level I Trauma Center of Maine Hospital in Huntsville, Alabama.

Dr. James Flatt, certified as a medical expert in the field of urology, testified he was on call the night the victim was transported to Huntsville Maine Hospital. When he reported to the victim's surgery room, he found two tears in the victim's bladder, which left eighty percent of the front and top of the victim's bladder torn open. He testified that the tears were "straight cut[s]" that only a sharp instrument, such as a knife, could make. Dr. Flatt closed the victim's bladder and placed a tube in the victim's bladder so it would drain properly. He estimated this repair took thirty minutes. On cross-examination, Dr. Flatt said the State had never asked him to view either the knife seized from the Defendant's truck or the underpinnings of the truck.

Dr. Rony Najjar, a trauma surgeon at Huntsville Maine Hospital and certified as an expert in the area of trauma surgery, testified he treated the victim immediately after she arrived at Huntsville Maine Hospital. He was the attending surgeon in the victim's surgery room. Dr. Najjar recalled that the victim, in physiological shock, was in extremely critical condition when she entered the surgery room. Dr. Najjar learned the victim suffered her injuries from being run over by a truck. The doctor observed that the victim had multiple lacerations around her genital, pelvic, and buttock area. He testified one cut ran from the front right hip into her groin, another ran across her abdomen where the bladder would be, another ran across the left side of the groin area, and yet another ran on the backside of the right thigh and buttock. Dr. Najjar confirmed that the cuts on the victim's shorts coincided with the cuts he observed on her abdomen and groin. Also, the doctor observed that the victim's intestines were protruding from her perineum, the area between her legs. Reviewing her medical records, he confirmed that the victim had two lacerations on the fingers of her left hand. The victim's injuries made surgery immediately necessary.

Describing the emergency surgery performed on the victim, Dr. Najjar said that when he entered the victim's abdomen, he immediately noticed that the bladder bore two large cuts in the back and front that "lined up in a line." He recalled that the victim's intestines had protruded through the cuts in her bladder. The doctor explained that crushing or blunt force trauma causes a "very destructive type of pattern to the tissues," usually in the form of a "gaping hole"rather than the smooth cuts he found on the victim's bladder. Because the cuts on the bladder were long, linear, and smooth, allowing the intestines to pass through, Dr. Najjar believed something sharp like a piece of glass or a knife caused the cuts in the front and back of the bladder. He testified that the lacerations to the victim's bladder could "potentially" have caused her to lose consciousness "in a very short period of time."

On cross-examination, Dr. Najjar confirmed that the victim's medical records reflected that neither he nor any other doctor present noticed any obvious laceration or bruise to the victim's head or oral cavity. He confirmed that he asked Dr. William J. McFeeley to examine the victim and that Dr. McFeeley found the victim's head showed no signs of struggle, such as bruises around the eyes or behind the ears. He also reiterated that, while he could testify that a knife probably caused the cuts to the victim's bladder, he could not state with absolute certainty that a knife caused the cuts. Dr. Najjar confirmed that the State never asked him to examine the knife seized in this case or the underpinnings of the Defendant's truck.

On redirect examination, the State showed Dr. Najjar the knife seized from the Defendant's truck, and the doctor testified that the knife could have been used to make the lacerations in the victim's bladder.

On recross examination, Dr. Najjar reiterated that he could not state with "100 percent" certainty that the knife seized from the Defendant caused the cuts to the victim's bladder. Also, the doctor agreed that a person could receive both penetrating and blunt trauma injuries from an automobile accident.

Trooper Allan Brenneis, a trooper with the Tennessee Highway Patrol's Critical Response Team, testified that his team reconstructs crash crime scenes. He recalled that he reported to the Welcome Center in Giles County on the night in question. He testified that, when he arrived, he realized that the injury could not have occurred where the victim's body lay and the truck stood because the ground bore little blood. Wishing to investigate this discrepancy, he entered the cab of the truck and found it covered with blood.

Trooper Brenneis used a computer program to create a "Situation Map" documenting his observations about the scene of the accident. The map reflected that Trooper Brenneis found the victim's blood beside the area of the curb worn down by trucks passing over the protruding portion of the curb.

9

The trooper then reviewed a series of photographs he took the night of the accident and explained what they depicted. Several photographs show patches of blood on the grass, near the protruding portion of the curb where several witnesses testified the victim lay after she was run over. The trooper testified this picture also showed tire tracks running over the curb. One photograph showed blood spattered on the back rear tire. Another photograph showed a blood-spattered calender attached to the interior of the upper portion of the driver's side door. Another showed that the passenger window contained a large amount of blood on both its interior and its exterior. The next photograph showed the outside of the passenger's door. The door contained blood spatter rather than a dripped line of blood, which indicated that the blood struck the door at a high velocity. Another photograph showed blood spattered on the front corner of the trailer immediately behind the truck cab, spattered from mid-way up the corner of the trailer to the top of the trailer's corner, and spattered above the passenger window.

The Defendant told Trooper Brenneis that, after the victim opened her door at the Welcome Center, their dog jumped out, the victim got out to follow him, and the Defendant then accidentally ran over the victim. After viewing the truck's cab, the trooper was confused about why the interior of the cab was bloody, so he asked the Defendant to explain the blood. The Defendant told the trooper that he had cut his finger that morning, but the trooper noted that this cut could not have been the source of all the blood in the truck's cab. Trooper Brenneis also reviewed several photographs he took of the Defendant. In these, the Defendant's legs and shorts appear bloody, but his hands appear clean.

On cross-examination, Trooper Brenneis explained that the TBI took over the investigation of the accident a short time after he arrived on the scene and that the TBI only asked him to create the Situation Map and did not request further accident reconstruction. Also, neither the TBI nor his superior officers within the Highway Patrol asked him to examine the truck's underpinnings. He testified that he ordinarily would have examined the underpinnings in order to determine whether they bore human matter. The trooper also acknowledged that he did not determine how deep the blood on the curb where the victim lay had soaked into the ground.

Trooper Brenneis confirmed that the truck's windshield was cracked and that a low impact force from within the truck's cab appeared to have caused the crack. He testified, however, that he found no hair or blood from the victim near the windshield to suggest that the victim's body collided with the windshield.

Trooper Jason Kelley of the Tennessee Highway Patrol testified he reported to the Ardmore Welcome Center and saw a tractor-trailer sitting in the emergency lane where it had exited the Welcome Center parking lot. When he arrived, emergency responders and

10

Ardmore police officers were already present. The officers pointed him toward the victim, and he saw the Defendant sitting at the victim's head, giving her water. When he asked the Defendant what happened, the Defendant said that the victim had opened the door to let the dog out to urinate, the dog jumped out, and the victim jumped out after the dog. The Defendant said that when she jumped out, he "r[a]n her over." The trooper asked the Defendant to get his paperwork and log book from his truck, and the Defendant complied. Trooper Kelley filled out paperwork and informed another officer that a vehicular homicide may have occurred.

The trooper recalled that, while he spoke with the Defendant, he noticed the Defendant had blood on his hands and clothing. He described the Defendant as "very emotional–about half-crying. He would cry a little bit, you know, stop. Just seem[ed] very emotional."

Trooper Kelley then entered the truck's cab. Inside, he found a cooler half-full of bloody water. He also noticed blood stains covering the inside of the cab, on the glass, the windows, the dash, and the floor. He recalled that the cab was "disarranged," with "stuff thrown around."

On cross-examination, Trooper Kelley confirmed that, because his observations led him to believe the Defendant was intoxicated, he arrested the Defendant on suspicion of driving under the influence ("DUI") and later charged him with DUI. The Trooper did not find blood outside the truck anywhere other than where the victim's body lay. He testified he shut down the Welcome Center's exit lane so that no one could leave without being interviewed. He recalled that no one had noticed that the victim had received a knife-wound before she was run over. The trooper testified he never received any information that the victim had placed her bleeding hand inside the cooler. Finally, Trooper Kelley confirmed that the Defendant appeared distraught the night of the accident and persistently asked to be allowed to go to Huntsville Maine Hospital to be with the victim.

On redirect examination, Trooper Kelley testified he did not see anything in the underpinnings of the truck that was sharp or jagged that could have cut the victim. On recross examination, the trooper acknowledged he did not crawl beneath the truck to examine its underpinnings. He confirmed that a photograph of the Defendant's truck showed a protrusion common to such trucks: a piece of metal behind the rear wheel used to slide the tandems on the rear axles. Trooper Kelley testified that no blood appeared on the protrusion he identified in the photograph.

Scott Brandon testified he was a Special Agent for the Criminal Investigation Division of the Tennessee Highway Patrol at the time of the accident but had since retired. Brandon arrived at the Welcome Center shortly after midnight, and the victim had already been

transported to the hospital by the time he arrived. Brandon recalled that the Defendant's truck was still sitting in the exit ramp of the Welcome Center, and the Defendant was speaking with an officer. He testified he explained to the Defendant his rights under *Miranda v. Arizona* and questioned him inside the Welcome Center.

Brandon testified the Defendant first described his and the victim's Chicago to Jacksonville "run" and then told Brandon he had inadvertently run over the victim when she got out of the truck at the Welcome Center to chase their dog. The Defendant's statement was reduced to writing, and Brandon read the Defendant's statement into evidence. The Defendant's statement set forth the following account of what occurred after he and the victim left Jacksonville to return to Chicago:

> We then went to Blakely, Georgia, and picked up a load of peanuts. We left there, yesterday, around 11 or 12 a.m. We stopped in Birmingham, Alabama, and had a couple of beers. We went to part of Dixey, Harley Davidson store. We bought some t-shirts. And we slept about four hours in the truck. We argued about getting her son a t-shirt. It was just a little argument. I didn't have enough money.

> We left Birmingham and stopped at the Welcome Center in Tennessee. We slept maybe a couple of hours. We did not get out. We went to leave. As we went to leave, and the dog started playing, I stopped at the drive while they were going out. Gloria [the victim] opened the door and the dog jumped out. Gloria went after the dog. I pulled up to get out of the drive, a man came up, yelling, Stop, stop; I think you have run her over. I went back to Gloria and she was bleeding bad. I put the dog in the truck and ran back to her. The guy called 911.

The Defendant did not explain to Brandon why the truck's cab was covered in blood, and he did not mention the victim being cut. The Defendant's hands were not bloody when Brandon interviewed him, and Brandon did not recall the Defendant's clothing being bloody. Brandon recalled seeing a small "nick" on the Defendant's hand, but the Defendant did not explain what caused the nick.

On cross-examination, Brandon confirmed that a photograph of the back of the Defendant's right hand showed the small "red mark" or "scratch" that he recalled seeing during the interview.

Investigator Brad Elliot, a Special Agent, Criminal Investigator II with the TBI, received a call at 3:30 a.m. from District Attorney Mike Bottoms on the night of the accident.

12

General Bottoms requested Investigator Elliot go to the Welcome Center. The investigator arrived at 4:45 a.m. and requested all traffic through the Welcome Center be stopped and everyone interviewed for information regarding the incident.

Investigator Elliot saw the Defendant seated on a bench outside the Welcome Center, so he introduced himself and took the Defendant inside the Welcome Center to an office. After he Mirandized the Defendant, the Defendant invoked his right to speak with an attorney, so the investigator ceased the interview and allowed the Defendant to use the restroom and sit outside. He instructed the Defendant he was not free to leave the scene.

As the Defendant waited inside, Investigator Elliot continued his investigation. He observed the blood spatters where the victim lay, outside the passenger door, and inside the truck's cab. The investigator entered the cab through the driver's side to retrieve the Defendant's medication for him and noticed blood spatter in the cab. As the investigator entered, he noticed a "large folding knife" lying on the driver's side corner of the dash. He testified the knife had a reddish brown blood stain. Having observed the blood splatters within the cab and the bloody knife, Investigator Elliot determined that a struggle likely occurred inside the truck's cab rather than outside. Consequently, he confined his investigation to inside the truck's cab and did not request additional agents to search the area surrounding the truck for discarded weapons.

Investigator Elliot confirmed that as daylight returned he took several photographs, which were shown to the jury, of the truck after his unit had the truck towed. One photograph showed the steering wheel and the instrumentation and controls on the dashboard and blood splattered across the steering wheel. Another photograph showed an open red and white cooler between the driver and passenger seats. The cooler had blood splatter on its sides and the top rims of the sides, and inside the cooler was a red liquid and soft drink cans. A final photograph showed the disarray of the compartment area in the front area of the cab.

The investigator recalled that, the day following the incident, General Bottoms charged the Defendant with attempted first degree murder, and the Defendant was transported to Giles County jail in Pulaski, Tennessee. At the jail, Investigator Elliot and Deputy Scott Nations prepared to serve the charging instrument upon the Defendant in a holding area of the jail. The investigator, Deputy Nations, and the Defendant gathered at a desk in the holding area, and the Defendant was read a copy of the warrant and the official charge. At this point, the Defendant told Investigator Elliot he needed to "tell [him] something." The investigator reminded the Defendant that he could not ask the Defendant any questions because the Defendant had requested an attorney, but the Defendant insisted on speaking with the investigator in private.

13

Investigator Elliot then escorted the Defendant into a small office near the holding area and said, "What [is it you] want to tell me[?]" Investigator Elliot described the version of the accident the Defendant then gave him:

> [The Defendant] replied that he could explain all the blood inside the cab of that truck: That they were riding down the road. That [the victim] had his knife out playing with it. That she had cut two fingers on her left hand, and had been waving her hand around inside the cab.

> [The Defendant] further told me that they had gotten band-aids out, applied band-aids to the cuts. That they had arrived at the Welcome Center. He was not sure when the cutting had occurred.

> He had further stated, they arrived at the Welcome Center. They had slept for approximately two hours at the entrance of the Welcome Center. And that, as they were proceeding to leave, because they felt like she needed medical attention for stitches for the cuts, that the dog needed to get out to use the restroom, so they're stopped in the exit lane, exiting the Welcome Center. And that, he was going to get out and go around to let the dog out, and somehow the dog got out. And after the dog [got] out, he pulled forward to pull over and park. And as he was doing that, the man ran up and was banging on his door and told him that he run over somebody. And that, he had stopped [his] truck, went back to check on [the victim].

> And the last statement he made to me was that, he could not have done what he saw her condition to be in. I did ask [the Defendant] if he wanted to tell me the truth at that point. He said, I am telling you the truth. And I ended the conversation at that point, and told [the Defendant] I had other things to take care of.

The investigator and the Defendant then left the office, the Defendant went back to the holding area, and the investigator collected the clothes the Defendant wore the night of the accident. All the clothes were bloody, including the Defendant's socks. The investigator understood that the Defendant's clothes were bloody because he was attending to the victim, but the investigator did not believe that this would explain why his socks were bloody. Investigator Elliot identified the victim's bloody shorts, socks, and tennis shoe as items he received from the Emergency Medical Services. He also identified a bloody pillow case he recovered from the scene.

On cross-examination, Investigator Elliot recalled that, when he arrived on the scene,

14

officers had neither stopped traffic from traveling through the Welcome Center nor marked off the area surrounding the truck with crime scene tape. Investigator Elliot accordingly stopped traffic and marked off the area surrounding the truck in order to secure the scene. Also, he seized and secured the two "deadly weapons" used by the Defendant: the knife and the tractor-trailer. Investigator Elliot said he did not ask Trooper Brennais to make a complete accident reconstruction map because he was more concerned with what had occurred inside the truck's cab than what had occurred outside the truck. He explained that, because Solomon witnessed the truck run over the victim, he felt he should focus his investigation on the struggle inside the truck's cab, which no independent bystander witnessed.

The investigator estimated that the truck's driver and passenger seats were two feet apart. The investigator agreed that if both the passenger and driver were seated upright in the center of each seat, the passenger and driver could reach out and touch the other. He agreed that a person could not exit the rear portion of the cab without passing through the area between the passenger and driver seats.

Investigator Elliot testified he did not become aware of the victim's lacerated bladder until after the night in issue. Because he was unaware of this injury, he did not ask the TBI to search for uric acid, which would leak from a perforated bladder, on the knife or in the truck's cab and the area around the truck. The investigator agreed that, because he did not request these tests, he possessed no proof that the victim's uric acid leaked onto the knife or into the truck's cab or onto the ground surrounding the truck. Investigator Elliot testified he observed blood on the rear right tire and its mudflap, but he did not closely examine the area between the tire and the mudflap. As a result, the investigator conceded he could not conclusively say no blood and tissue were trapped between the tire and the mudflap.

The investigator recalled that the Defendant did not make any statement that indicated he knew that the victim's bladder was lacerated. Although the Defendant was arrested in the early morning hours of the day following the incident, he was not charged with attempted first degree murder until later that day.

On redirect-examination, Investigator Elliot said he was not aware of a test the TBI performed to detect uric acid.

Robert E. McFadden, a Special Agent Forensic Scientist with the TBI in Nashville, testified he and Investigator Charles Hardy examined the truck cab, photographed the cab, and collected several items from the cab for analysis at the TBI laboratory. One of the items collected was the Defendant's knife, which they found on the dashboard of the truck, and upon which Agent McFadden was unable to find identifiable prints. The agent collected a

15

partial finger print and a partial palm print from the passenger window. He testified he did not compare these prints with any known individual's prints.

Linda Littlejohn, a scientist in the Nashville TBI Crime Laboratory, was certified by the trial court as an expert in area of fiber analysis. She testified she was asked to analyze the knife collected in this case and the shorts the victim wore when she was run over. Littlejohn prepared a report of her findings that reflect that she found fibers on the knife and that she compared these fibers to the shorts' fibers by mounting fibers from the shorts on a slide. Physical and microscopic examination of these fibers revealed both fibers to be constructed of blue and white cotton fibers.

On cross-examination, Littlejohn testified the blue and white fibers "could be" from denim blue jean material. She explained she could not determine whether the fibers from the knife were exactly similar to the fibers from the shorts, saying that "there's not a lot that you can say about cotton fibers." She testified that knives commonly have blue and white cotton fibers because they are commonly carried inside blue jean pockets.

Charles Hardy, a Special Agent of the Serology and DNA Analysis Unit of the Nashville TBI Crime Laboratory, was certified by the court as an expert in the area of DNA analysis and comparison process. The agent explained that, in general, he examines physical evidence for body fluids and genetically compares these body fluids to those of a known individual by constructing a DNA profile of each sample. Agent Hardy recalled that he and Agent McFadden examined and inventoried the truck and collected the knife and several other items from the truck. These items included a piece of mattress from the lower bunk bed in the truck cab, a cigarette butt from the ashtray, and a stained envelope from above the driver's visor. He also collected swab samples from reddish brown stains they observed inside the truck. These reddish brown stains appeared on the gear shift lever, the outside surface of the passenger window, the passenger side of the driver's seat, the driver's side windshield, the passenger's side of the windshield, the passenger side hand-hold at the rear of the cab, the calendar above the driver's seat, the blade and handle of the knife on the dashboard, and the top middle surface of the dashboard. The agent also analyzed the Defendant's socks as well as a grocery bag found within a black duffel bag in the truck cab.

Agent Hardy identified a "blood swatch card" he created to profile the Defendant. Agent Hardy created this card by placing the Defendant's blood on a piece of paper and letting it air-dry. This was the standard he used in his DNA analysis. He also collected finger nail scrapings and oral swabs from the victim.

Agent Hardy described the results of his DNA analysis stating that all of the samples

16

taken from the reddish brown stains both inside the truck and on the rear passenger side of the trailer contained the victim's blood. Also, he determined that the victim's nails scrapings did not contain another person's DNA and that the victim's socks contained her own blood. Finally, both the blade and the handle of the knife contained the victim's blood.

On cross-examination, Agent Hardy explained that a different department of the TBI laboratory is responsible for testing samples for uric acid. He said that he did not receive a request to test the samples in this case for uric acid but that, if he had, he would have sent the samples to the appropriate department.

On recross-examination, the agent said he did not see body tissue on the bloody knife that he collected from the truck, saying that, had he found such tissue, he would have performed DNA analysis upon it. Upon further direct examination, Agent Hardy testified that, in his experience, knives used in cuttings do not always contain body tissue.

Michael Tomaso, a Chicago, Illinois, police officer, testified he and his partner, Christina Pena, were assigned to a "battery-in-progress" in Chicago in April 2006. When they arrived, a man they later identified as Thomas Edwards approached them and said he had fought with a man they later identified as the Defendant. Officer Tomaso found the Defendant and began to interview him, and Officer Pena interviewed Thomas Edwards. Because the Defendant was highly intoxicated and belligerent, the officers handcuffed him. Officer Tomaso recalled the Defendant then said, "This is f---ing bullshit because he's mad because what I did to his sister."

Having determined that Edwards was the victim in this altercation with the Defendant, the officers began to place the Defendant in the back seat of their squad car. The Defendant continued to grumble about why Edwards was upset, and then the Defendant said, "I wish I had done it right the first time."

On cross-examination, Officer Tomaso acknowledged that he did not record the Defendant's statements in the report of the battery he prepared the night of the battery. He explained he did not believe doing so was necessary because he was merely investigating the battery, not the attempted murder. He emphasized that he had no knowledge of the circumstances surrounding the Defendant's case in Tennessee involving the victim. Officer Tomaso did not testify in the Defendant's trial on the charge that resulted from his altercation with Edwards.

Officer Tomaso did not clearly recall speaking with the Defendant's attorney one week before trial. According to the officer, his supervisor had instructed him not to speak with attorneys.

Officer Christina Pena, Officer Michael Tomaso's partner, explained that the address to which they responded to the battery-in-progress was a bar. She recalled that, after she and her partner separated the parties, she interviewed Edwards and encouraged him to calm down. Edwards calmed down and stood peacefully by his vehicle. She confirmed that the Defendant was highly intoxicated and that she and her partner handcuffed him for their safety. She recalled they asked the Defendant to sit in the back of their patrol car so they could ascertain the nature of the dispute. She testified that, when she opened the patrol car door, the Defendant said, "[T]his is bullshit; I should have did things right the first time." Officer Pena placed the Defendant in the vehicle, and then walked around and sat in the driver's seat. She and Officer Tomaso conducted an initial field interview of the Defendant. She explained that, during a field interview, a subject is not in custody but rather is only detained for a moment while the officers verify the subject has no outstanding warrants. During this interview, the Defendant told the officers that he had been charged in Tennessee with attempting to kill Edwards's sister.

At the conclusion of the trial, the jury convicted the Defendant of attempted first degree murder, and the trial court sentenced the Defendant to twenty-two years in the Tennessee Department of Correction.

The Defendant timely filed a petition for a Writ of Error Coram Nobis, stating that after trial the victim gave several oral and written statements recanting her trial testimony. The court held a hearing to dispose of this and other post-trial motions. At this hearing, the victim testified that, at trial, she had falsely testified that the Defendant knocked her unconscious and stabbed her lower body. She said that her family had encouraged her to lie because they were angry with the Defendant and that she lied at trial in order to punish the Defendant. The victim testified that she still loved and missed the Defendant, that he was a "good person," and that, because the Defendant "was always there for [her]," she "need[ed] him so much more, now." She said that the Defendant only cut her fingers during their argument on the highway and that he never stabbed her anywhere else on her body. She insisted that she never lost consciousness and that the Defendant never attacked her while they were stopped at the rest stop.

The trial court rejected the victim's recanted testimony, noting that the victim never actually testified at trial that the Defendant had stabbed her anywhere other than her hand. Instead, the victim testified only that she remembered being knocked unconscious, struggling with the Defendant, and noticing blood running down her legs as she got out of the truck. The trial court explained that the Defendant's guilty verdict was based on the multiple wounds to the victim's pelvic region and the physicians' testimony that a sharp instrument caused the lacerations to the victim's bladder. The trial court also noted that, because the

18

Defendant testified neither at his trial nor the coram nobis hearing, he failed to provide an alternative version of how the victim sustained her injuries. Given the inconsistencies and weaknesses in the victim's new testimony, the trial court explained it was not reasonably satisfied that the victim's trial testimony was unreliable and that her recantations were true. As such, the trial court denied the Defendant's petition for a Writ of Error Coram Nobis.

## II. Analysis

On appeal, the Defendant contends: (1) the evidence was insufficient to support his conviction; (2) the trial court erred when it admitted statements the Defendant gave to Illinois police; (3) the trial court erred when it allowed two witnesses to testify although the State had failed to disclose their existence in accordance with Tennessee Rule of Criminal Procedure 16; and (4) the trial court erred when it denied the Defendant's petition for a writ of error coram nobis based on the victim's recanted testimony.

### A.  Sufficiency of the Evidence

The Defendant contends the evidence submitted at trial was insufficient to establish his guilt of attempted first degree murder. Specifically, he contends the evidence does not support a finding of premeditation, because the record fails to show he procured a weapon, concealed evidence, or was particularly cruel. Also, he argues that any stabbing that occurred inside the truck's cab did not establish "continuous deliberation" and that his efforts to comfort and aid the victim show he was not "calm" after his actions. The Defendant also contends that the State's evidence fails to conform to several evidentiary standards to which he argues circumstantial evidence must conform in order to support a finding of premeditation. *See State v. Gentry*, 881 S.W.2d 1, 4 (Tenn. Crim. App. 1993). Finally, he argues that his struggle with the victim in the truck's cab shows he was not free from the "excitement and passion" a defendant must lack in order to commit attempted first degree murder. *See* T.C.A. § 39-13-202(d) (2006). As to the jury's finding that he ran over the victim with the intention of killing her, the Defendant argues that his intoxication incapacitated him from forming the intent to kill the victim.

The State responds that the evidence shows that the Defendant cut the victim's fingers and stabbed her, lacerating her bladder, before he intentionally ran over her with his tractor-trailer. Consequently, the State argues, the evidence shows that the Defendant spent considerable time contemplating the harm he would cause the victim, thus supporting the jury's conclusion that the Defendant premeditated the victim's death.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State,

"any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R.App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court. *Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000). Importantly, the credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. *Bland*, 958 S.W.2d 651 at 659.

In this case, the Defendant was convicted of attempted first degree murder. Tennessee Code Annotated section 39-12-101(a) states:

A person commits criminal attempt who, acting with the kind of culpability

otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step towards the commission of the offense.

T.C.A. § 39-12-101(a)(1)-(3) (2006).

First degree murder is the intentional and premeditated killing of another. T.C.A. § 39-13-202(a)(1) (2006). An "intentional" killing is one committed by a person "who acts intentionally with respect . . . to a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." T.C.A. § 39-11-302(a) (2006).

"Premeditation" is defined as "an act done after the exercise of reflection and judgment" and committed after the accused "was sufficiently free from excitement and passion as to be capable of premeditation." T.C.A. § 39-13-202(d) (2006). This is a question of fact for the jury to determine, and it may be proven by circumstantial evidence, including evidence of: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660. In general, circumstantial evidence of premeditation should tend to show planning activity by the Defendant, motive to cause the victim's death, and "facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the Defendant must have intentionally killed according to preconceived design." *See Gentry*, 881 S.W.2d at 4-5 (quoting 2 W. LaFave and A. Scott, *Substantive Criminal Law* § 7.7 (1986).

In the case under submission, the evidence when viewed in the light most favorable to the State proved that, while the Defendant and victim argued as they drove from Alabama to Tennessee, the Defendant swung his knife at the victim, slicing her fingers. The couple then stopped at the Ardmore Welcome Center to get medical attention for the victim's injury

to her hand.  After the Defendant pulled the tractor-trailer up to the curb in front of the Welcome Center and the victim turned around to retrieve medication from the back of the truck's cab, he attacked the victim from behind, striking her in the back of the head.  The victim fell on a bed in the rear of the cab and began to go in and out of consciousness.  She and the Defendant struggled in the back of the cab until the Defendant relented and sat back down in the driver's seat.

After the Defendant returned to the driver's seat, the victim gathered her things and got out of the truck.  When she got out, she realized blood was rushing down her legs and pooling into her socks and shoes.  Medical examination later revealed that the victim's bladder was lacerated by a knife-like object and that her pelvic region bore several slice marks.  Also, the interior of the truck's cab was covered in blood, and blood had spilled into a cooler inside the truck.  Both the nature of the victim's wounds and the large amount of blood inside the truck indicate that the Defendant had stabbed the victim several times as they struggled in the back of the cab.

Having seen a man standing near the rear of the truck, the victim began to walk toward the man to ask him to help her get medical attention.  As she walked alongside the truck, someone instructed the Defendant to move the truck from where it was parked in front of the Welcome Center.  The truck began to move, and the trailer knocked the victim to the ground and into the path of its passenger-side rear tire.  The truck continued moving and ran over the victim's body.  Although her initial prognosis was grim, the victim survived her injuries, which included disembowelment, a crushed pelvis, a lacerated bladder, and multiple cuts to her pelvic region.

First, we conclude that the evidence establishes that the Defendant stabbed and cut the victim while they were parked in front of the Welcome Center.  The stab wounds inflicted by the Defendant upon the victim's abdominal and pelvic region were severe enough to be life-threatening.  This conduct alone supports the jury's finding that the Defendant acted with the intention to cause the victim's death.  This act also supports the jury's inference that the Defendant acted with premeditation when he later drove his tractor-trailer over her body.  As the Defendant argues, the record may lack proof that the Defendant procured a weapon or concealed evidence.  The record does include, however, circumstantial proof that the Defendant planned to kill the victim and had a motive to kill the victim in the particularly cruel manner of running over her body:  The Defendant stabbed the victim, who was unarmed, several times on her hand.  The Defendant then refused to stop to get medical attention for the victim's hand, because he did not want her to report his behavior.  Although the Defendant ultimately stopped ostensibly to get medical help, his fear of being discovered colors his later act of running over the victim.  After he stopped the truck, the Defendant attacked the victim, stabbing her in her abdominal and pelvic region.  The record supports

the reasonable inference that, after having severely injured the victim, the Defendant allowed her to get out of the truck so that he could mask her stab wounds by "accidentally" running over her. As the victim walked toward the back of the truck, the Defendant, a seasoned commercial truck driver, drove his truck so that it knocked the victim to the ground and then rolled over her body. The Defendant then displayed a somewhat calm demeanor by responding in disbelief rather than alarm when Solomon informed him he had run over the victim.

The Defendant's argument that his altercation with the victim caused him to be excited and passionate in a way that prevented him from acting with premeditation is not supported by the victim's testimony that the Defendant took his driver's seat after they struggled and sat calmly while she got out of the vehicle. The record sufficiently supports the jury's determination that the Defendant exercised reflection and judgment before running over the victim and that no "excitement or passion" prompted him to run over the victim. *See* T.C.A. § 39-13-202(d).

Also, we conclude the evidence supports the jury's inference that the Defendant intentionally ran over the victim. As we discussed above, the Defendant was a seasoned truck driver, his assertion that he accidentally ran over the victim strikes this Court as disingenuous. Further, the statement to Illinois police that he "should have done it right the first time" is a bare acknowledgment that he intended to kill the victim rather than only accidentally run over the victim. Finally, the record does not demonstrate that the Defendant's intoxication was serious enough to incapacitate him from forming the intent to kill the victim. *See Harrell v. State*, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979) ("Proof of intoxication alone is not a defense to a charge of committing a specific intent crime . . . there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent."). As the victim testified, the Defendant navigated his tractor-trailer on the highway without difficulty and no responding officers recalled that the Defendant was highly intoxicated. As such, we conclude the evidence supports the jury's determination that the Defendant intended to kill the victim when he ran over her with his truck.

In summary, a rational jury could conclude that the Defendant premeditated killing the victim, that he intended to kill the victim when he drove the truck forward, and that he believed running over the victim would cause the victim's death without further conduct on his part. Therefore, the evidence was sufficient for a rational juror to conclude beyond a reasonable doubt that the Defendant was guilty of attempted first degree murder. The Defendant is not entitled to relief on this issue.

**B. Admissibility of the Defendant's Statements to Chicago Police Officers**

23

The Defendant contends the trial court violated his constitutional rights to counsel and against involuntary self-incrimination when it admitted the statements the Defendant gave to Illinois police officers. He argues he gave the incriminating statements while he was in police custody in response to police interrogation, which was initiated without *Miranda* warnings. The State concedes that the Defendant was in police custody at the time of the statements, but it argues that he made his statements spontaneously and not in response to any question posed by Illinois police officers.

The statements to which the Defendant objects occurred in the course of Illinois police officers' response to a battery-in-progress involving the Defendant and David Edwards, the victim's brother. Soon after the officers arrived, they determined that the Defendant should be handcuffed because he was intoxicated and belligerent. As Officer Tomaso was handcuffing the Defendant, the Defendant said, "This is f---ing bullshit because he's mad because what I did to his sister." The officers then began to place the Defendant in the back of their squad car in order to question him about his altercation with Edwards. While he was being placed in the car, the Defendant said, "I wish I had done it right the first time." The officers then began to interview the Defendant about his fight with Edwards, and he informed them he had been charged in Tennessee with attempting to murder Edwards's sister. Police were unaware of this pending charge at the time the Defendant made statements regarding the victim.

In disposing of the Defendant's motion to suppress his statements to Illinois police, the trial court found first that, because the officers handcuffed the Defendant, the Defendant was in custody and, thus, his *Miranda* rights had attached when he made his statements. The trial court went on to find, however, that his statements were not taken in violation of *Miranda* because they were not given in response to interrogation within the meaning of *Miranda*. The trial court explained that Officers Pena and Tomosa were not Tennessee officials and had no independent knowledge of the charges in this case. Thus, the officers could not have intended to question the Defendant about this case when they asked the Defendant to explain why he was fighting with Edwards. As a consequence, the court concluded, admission of the Defendant's statements would not violate the Defendant's rights to counsel and against involuntary self-incrimination.

In Tennessee, when a defendant brings a claim that his statement should be suppressed due to its not being knowingly and voluntarily given, this Court reviews the facts while giving great deference to the suppression hearing judge. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). The application of law to fact is reviewed de novo. *State v. Bridges*, 963 S.W.2d 487 (Tenn. 1997). The findings of the trial court will be upheld unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).

24

The Fifth Amendment to the United States Constitution provides in part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, article I, section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. The United States Supreme Court has held that the protections afforded by the Fifth Amendment require that precautions be taken before statements obtained through custodial interrogation are allowed as evidence against an accused. *Miranda v. Arizona*, 384 U.S. 436, 479 (1964). Generally, when statements made by an accused are the product of a custodial interrogation by law enforcement officers, the statements may not be admitted into evidence unless the accused is:

> Warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id*. Only when the suspect is informed of his rights via the *Miranda* warnings may a suspect be deemed to knowingly and intelligently waive the right to remain silent and the right to an attorney. *Id*. Moreover, any statement obtained after a waiver of this right must be voluntary and not be extracted by "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542-43 (1987).

The protections provided under *Miranda* do not apply in every instance where a police officer questions a suspect; rather, these protections only apply "when the defendant is in custody and is subjected to questioning or its functional equivalent." *Walton*, 41 S.W.3d at 82. *Miranda* warnings are required only when a person is subject to custodial interrogation by law enforcement. "Custodial" means that the subject of questioning is in "custody or otherwise deprived of his freedom by the authorities in any significant way." *Miranda*, 384 U.S. at 479. "Interrogation" has been interpreted to refer to questions that law enforcement officers should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). In order for *Miranda* to apply, the suspect's statements must be in response to interrogation by law enforcement personnel, or the suspect must know that he is being interrogated by an agent of the State. *State v. Brown*, 664 S.W.2d 318, 321 (Tenn. Crim. App. 1983); *see Illinois v. Perkins*, 496 U.S. 292, 296-97 (1990). "Absent either one of these prerequisites, the requirements of Miranda are not implicated." *Id*. For instance, on-the-scene questioning does not require *Miranda* warnings. *Miranda*, 384 U.S.

25

at 477; *State v. Goss*, 995 S.W.2d 617, 629 (Tenn. Crim. App.1998).[1]

We agree with the trial court that the Defendant's statements were not admitted in violation of his rights to counsel and against involuntary self-incrimination. We agree that, at the time of the Defendant's statements, he was in custody. The Defendant was handcuffed and then placed in the backseat of a police cruiser in the course of making the statements at issue. Thus, the Defendant was "deprived of his freedom" by Illinois police. *See Miranda*, 384 U.S. at 479. Given this, we conclude the Defendant was in custody when he made the statements at issue.

Fatal to the Defendant's objection, however, is the fact that he was not being interrogated when he made the statements introduced at trial. Officers Tomosa and Pena were Illinois police officers investigating a battery-in-progress outside a Chicago bar. These officers knew nothing about the Tennessee charge against the Defendant. As such, they could not have intended to elicit incriminating responses about this charge when they asked the Defendant why he and Edwards had fought. *See Brown*, 664 S.W.2d at 321. The police officers' inquiries were "on-the-scene questioning" limited to the altercation between the Defendant and Edwards. Further, the Defendant made several of his statements spontaneously, not in response to any question posed by the officers. None of the Defendant's statements to Illinois police were given in response to interrogation within the meaning of *Miranda*. Their admission, therefore, did not violate the Defendant's rights to counsel and against self-incrimination. He is not entitled to relief on this issue.

## C. State Compliance with Tennessee Rule of Criminal Procedure 16

The Defendant contends that the trial court erred when it allowed Officers Pena and Tomosa to testify about the Defendant's statements in Illinois. The Defendant argues first that, because the officers are not listed on the Defendant's indictment, their testimony

---

[1]In *Miranda*, the Supreme Court stated:

> When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

*Id.* at 477-78.

violates Tennessee Code Annotated section 40-17-106, which instructs the State to list witnesses that will testify at trial on the indictment. To this, the State responds that this section is only directory and, as such, does not require exclusion of the testimony of omitted witnesses, citing *State v. Harris,* 839 S.W.2d 54, 69 (Tenn. 1992).

Next, the Defendant argues that the trial court erred when it allowed the State to supplement its witness list with the officers' names one week before trial, which violated Tennessee Rule of Criminal Procedure 16(a)(1)(A), the state disclosure rule. He argues this late addition prevented him from traveling to Chicago to interview the officers before they testified at trial and gave him insufficient time to prepare to raise the *Miranda* issues involved in the officers' testimony. The State responds that it complied in good faith with Rule 16's disclosure rule because it disclosed the officers' testimony as soon as it had contact information. Furthermore, the State argues, the Defendant fails to show bad faith, undue hardship, or prejudice from the late disclosure. Finally, the State argues that, as Rule 16 does not authorize disclosure of the address of a State witness, the Defendant's inability to contact the officers has no bearing on his Rule 16 claim.

In addressing the Defendant's claim that the officers' testimony violated Tennessee Code Annotated section 40-17-106, we note that our Supreme Court has observed that it is "well settled" that this section is "merely directory," not mandatory. *State v. Dellinger*, 79 S.W.3d 458, 489 (Tenn. 2002). As such, section 40-17-106 does not necessarily disqualify from testifying a witness whose name does not appear on the indictment. *Id*.; *State v. Harris*, 839 S.W.2d 54, 69 (Tenn. 1992). Rather, the purpose of this section is to avoid surprising the defendant, thereby providing the defendant with an adequate basis upon which to prepare a defense. In *Harris*, our Supreme Court held that section 40-17-106 did not bar testimony from a witness disclosed to the defense only four days before trial because the State notified the defense as soon as it became aware of the witness and because defense counsel interviewed the witness before trial. *Id*. In this case, the State did not intentionally omit Officers Pena and Tomaso from the indictment; rather, the State disclosed their identities and their potential testimony to the defendant soon after the State itself became aware of their potential testimony. Because the State did not act in bad faith when it failed to list the officers' names on the Defendant's indictment, we conclude that the State did not violate Tennessee Code Annotated section 40-17-106.

The Defendant's second objection is that the State's supplementation of its witness list was improper because the State did not comply with the disclosure requirements of Rule 16. Tennessee Rule of Criminal Procedure 16 describes the procedure for the State's disclosure of evidence:

(a) Disclosure of Evidence by the State.

27

(1) *Information Subject to Disclosure.*

> (A) Defendant's Oral Statement. Upon a defendant's request, the state shall disclose to the defendant the substance of any of the defendant's oral statements made before or after arrest in response to interrogation by any person the defendant knew was a law-enforcement officer if the state intends to offer the statement in evidence at the trial;

> . . . .

(2) *Information not Subject to Disclosure.* Except as provided in paragraphs (A), (B), (E), and (G) of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal state documents made by the district attorney general or other state agents or law enforcement officers in connection with investigating or prosecuting the case. Nor does this rule authorize discovery of statements made by state witnesses or prospective state witnesses.

Tenn. R. Crim. P. 16(a).

To enforce this rule, Rule 16(d)(2) provides that if there has been noncompliance, the trial court may order the offending party to permit the discovery or inspection, grant a continuance, prohibit the introduction of the evidence not disclosed or enter such other order as the court deems just under the circumstances. *See State v. Leon Goins*, No. W1999-01681-CCA-R3-CD, 1999 WL 1531111, at *2 (Tenn. Crim. App., at Jackson, Dec. 27, 1999), *perm. app. denied* (Tenn. July 17, 2000). Whether a defendant has been prejudiced by the State's failure to disclose information is a significant factor in determining an appropriate remedy. *State v. Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). The Defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." *State v. Brown*, 836 S.W.2d 557, 560 (Tenn. 1993). The determination of whether to allow the witness to testify is left to the sound discretion of the trial judge, which is exercised upon examination of the circumstances presented in that particular case. *State v. Underwood*, 669 S.W.2d 700, 703 (Tenn. Crim. App. 1984) (citing *McBee v. State*, 372 S.W.2d 173 (Tenn. 1963)). "Thus, it is clear that the court has wide discretion to fashion a remedy that is appropriate for the circumstances of each case and the sanction must fit the circumstances of that case." *Id.* (citations omitted); *see State v. James*, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984).

The Defendant moved before trial for either a continuance or exclusion of the officers'

testimony based on the State's non-compliance with Rule 16. During the hearing on that motion, the State and the defense counsel described the chronology of the State's discovery and disclosure of the officers' statements: The Illinois officers observed the Defendant's statements in April 2006. In mid-September, the State became aware that the Defendant made statements about this case during his Illinois arrest. On September 19, 2006, the State provided a Witness List and Discovery of Disclosures to the defense. Although this list did not include Officers Pena and Tomaso, it included a note that the Defendant had given statements to arresting officers when he was detained in Illinois. After furnishing the witness list, the State began to contact Illinois officials in order to identify and locate the officers. On October 23, 2006, the State obtained the officers' names and badge numbers and provided these to defense counsel, and began to search for the officers' contact information. On October 30, 2006, the State obtained this contact information and furnished it to defense counsel. Trial began on November 6, 2006.

The trial court denied the Defendant's request to exclude the officers' testimony and for a continuance. It found that the State timely communicated and disclosed information to defense counsel. The trial court further found that the Defendant suffered no prejudice from receiving the officers' names and contact information only one week before trial. Although it denied the Defendant's motion, the trial court clearly communicated its willingness to grant a continuance in the event the Defendant came upon new information about the Defendant's statements and requested more time to investigate this information.

First, we note that Rule 16's application to the disclosure of the statements at issue is not altogether clear. As reproduced above, the language of Rule 16(a)(1)(A) requires disclosure of only defendant statements "made in response to interrogation." As we have discussed, the Defendant did not make his statements in response to police interrogation. Rule 16 did not obligate the State to disclose the statement at issue before trial. To be thorough, however, we will assume Rule 16(a)(1)(A) applies to the statements at issue.

Rule 16 requires the State to disclose the substance of a defendant's statements before trial, if defense counsel requests such disclosure. Here, the defense requested the State to disclose its witnesses and information it had about the Defendant's statements, and the State complied. It provided a list of witnesses, which included a note that Illinois police may have observed the Defendant make incriminating statements about this case. As the State gathered more information about what these officers observed, it communicated such information to the Defendant. The State gave defense counsel the officers' names and badge numbers the same day it obtained them, and it disclosed the officers' private cell phone numbers to the defense on October 30, also the same day it obtained the phone numbers. The State promptly informed defense counsel of the officers' potential testimony and, later, of the officers' contact information. The State, therefore, did not in bad faith provide the defense with the

29

officers' contact information only one week before trial; instead, the State in good faith provided defense counsel with information about the officers as it received the information.

Further, the Defendant fails to demonstrate how his late receipt of the officers' contact information "hindered trial preparation and defense at trial." *See Brown*, 836 S.W.2d at 560. Although defense counsel stated that, had he been given more advance notice, he would have traveled to Chicago to interview the officers, Officer Tomaso testified his supervisor instructed him not to speak about investigations with attorneys. Therefore, the extent to which a trip to Chicago would have produced valuable information is unclear. Further, the trial court said it would allow a continuance if at any point during trial defense counsel requested time to obtain specific evidence in connection to the officers' testimony. Because defense counsel never made such a request, defense counsel does not appear to have come across any new evidence with which to impeach the officers' accounts of his client's statements. As such, we do not perceive the timing of the disclosure of the officers' contact information to have deprived the Defendant of the ability to thoroughly prepare for the officers' testimony. *Smith*, 926 S.W.2d at 270. Because the Defendant has failed to demonstrate either bad faith non-compliance with Rule 16 or prejudice, we conclude that the trial court properly allowed the officers to testify. Tenn. R. Crim. P. 16(a)(1)(A); *Brown* 836 S.W.2d at 560. The Defendant is not entitled to relief on this issue.

## D. Writ of Error Coram Nobis

The Defendant contends the trial court erred when it denied his motion for a writ of error coram nobis based on the victim's recantation of her trial testimony. He argues that the evidence preponderates against the trial court's finding that the victim's new testimony was unreliable. The Defendant argues the record at trial and at the coram nobis hearing established that the victim's anger with the Defendant motivated her trial testimony and that this intent to falsely implicate the Defendant explains her convenient failure to recall what happened between the time when she supposedly lost consciousness and the time when she left the truck. The Defendant further argues that the victim's desire to falsely implicate the Defendant also explains why no medical record referenced or testifying medical expert observed an injury to the victim's head consistent the victim's testimony that she was struck from behind.

In response to the Defendant's arguments, the State largely adopts the coram nobis court's reasoning, arguing that the victim's trial testimony did not actually contain an assertion as to the cause of her pelvic and abdominal injuries and that evidence independent of the victim's trial testimony supported the Defendant's guilty verdict.

A proceeding in the nature of a writ of error coram nobis is available to convicted

defendants in criminal cases. T.C.A.. § 40-26-105(a) (2006). Whether to grant or deny a petition for writ of error coram nobis on its merits rests within the sound discretion of the trial court. *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007). It is well-established that the writ of error coram nobis "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999). In fact, newly discovered recanted trial testimony may serve as the basis for a new trial only where: "(1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told." *State v. Ratliff*, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001) (citing *Mixon*, 983 S.W.2d at 673 n.17); *see* T.C.A. § 40-26-105(b).

In the case at hand, we agree with the trial court that the Defendant did not meet his burden of establishing his eligibility for a new trial under *Ratliff* and *Mixon*. In essence, the Defendant has failed to establish the unreliability of the victim's trial testimony and, in turn, the veracity of the victim's testimony at the coram nobis hearing. We agree with the trial court that the victim's testimony at the coram nobis hearing that she did not recall the Defendant stabbing her while they struggled in the back of the cab does not actually conflict with her trial testimony that she could not recall what happened in the back of the cab because she lost consciousness. Because the victim never claimed to remember that the Defendant stabbed her and because the victim does not claim to have lied about losing consciousness, her most recent testimony is not inconsistent with her trial testimony. As such, the record does not preponderate against the coram nobis court's finding that "the testimony given by the material witness was false and the new testimony is true." *See Ratliff*, 71 S.W.3d at 298.

Further, the Defendant fails to establish that the jury might have reached a different conclusion "had the truth been told." *Id*. At trial, several physicians that attended to the victim testified that the lacerations to her bladder and abdominal region were straight line lacerations, likely caused by a sharp, penetrating object such as a knife. Also, the victim testified that blood was running down her legs and into her shoes when she got out of the truck. The victim's bloody shoes were introduced at trial to support this detail of the victim's story. The trial record, therefore, contains adequate evidence of the cause of the victim's abdominal and pelvic injuries to support the jury's finding that the Defendant stabbed the victim while they struggled in the cab. The record does not preponderate against the trial court's finding that the jury would not have reached a different result even assuming the veracity of the victim's new testimony. Because the Defendant fails to establish both the veracity of the victim's new testimony and the likelihood of a different verdict given this testimony, we conclude the trial court did not abuse its discretion when it denied the

Defendant's coram nobis petition. He is not entitled to relief on this issue.

## III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the evidence is sufficient to support the Defendant's conviction; that the trial court properly allowed Illinois police officers to testify about the Defendant's statements to them; and that the trial court properly denied the Defendant's motion for a Writ of Error Coram Nobis. As such, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE